**KEELER DIE CAST, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL–CIO, Intervenor.

Nos. 98–5536, 98–5635.

United States Court of Appeals, Sixth Circuit.

Argued June 8, 1999.

Decided July 8, 1999.*

Rehearing and Rehearing En Banc Denied Sept. 17, 1999.

---

* This decision was originally issued as an "unpublished decision" filed on July 8, 1999. On July 22, 1999, the court designated the opin-ion as one recommended for full-text publication.

536

David E. Khorey (argued and briefed), Mary C. Bonnema, Allyn R. Lebster, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Petitioner/Cross–Respondent in Nos 98–5536, 98–5635.

John D. Burgyne (briefed), Richard A. Cohen (argued and briefed), David Habenstreit, N.L.R.B., Office of General Counsel, Washington, DC, Aileen A. Armstrong, Dep. Assoc. Gen. Counsel, N.L.R.B., Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner in Nos. 98–5536, 98–5535.

Jordan Rossen (briefed), Nancy Schiffer (argued and briefed), Assoc. Gen. Counsel, International Union, UAW, Detroit, MI, for Intervenor in Nos. 98–5536, 98–5535.

Before: DAUGHTREY and MOORE, Circuit Judges; STAFFORD**, District Judge.

DAUGHTREY, Circuit Judge.

Following a decision of a panel of the National Labor Relations Board finding Keeler Die Cast guilty of an unfair labor practice for refusing to bargain with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), the company has petitioned for review of the Board ruling. The Board in turn requests that we enforce the entered administrative order. Because we conclude that Keeler failed to carry its heavy burden of establishing irregularities in the union representation election at Keeler's Stevens Street facility in Grand Rapids, Michigan, we deny the company's petition for review and grant the NLRB's application for enforcement.

### FACTUAL AND PROCEDURAL BACKGROUND

On October 7, 1996, the UAW filed with the Board a petition for a certification election at the Stevens Street plant of Keeler Die Cast in Grand Rapids, Michigan. The union and the employer then entered into a "Stipulated Election Agreement" in which the parties agreed, among other things, that the appropriate collective bargaining unit for the representation election consisted of:

All full-time and regular part-time production and maintenance employees including all leadmen, quality auditors, and material handling clerks employed by the Employer at its facility located at 236 Stevens Street, S.W., Grand Rapids, Michigan; BUT EXCLUDING all office clerical employees, quality analysts, technical employees, professional employees, casual employees, guards and supervisors as defined in the Act.

The representation election was held on December 12, 1996, and 174 of the eligible 181 employees voted. Of those casting ballots, 95 employees supported union representation and 79 employees voted against such representation. Although

** The Honorable William H. Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

none of the votes cast were challenged by either Keeler or the UAW, the employer later filed six objections to the union's pre-election conduct. A hearing was conducted on those objections and the hearing officer prepared a report and recommendation to the Board suggesting that all objections be overruled and that a certificate of representation issue. Despite the hearing officer's determinations, Keeler refused to bargain with the UAW. The union thus lodged unfair labor practice charges against the company pursuant to the provisions of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). A panel of the Board found no merit to any of Keeler's contentions and ordered the employer to bargain with the UAW. From that determination, the company petitions for review. The Board itself also petitions this court for enforcement of its prior order.

## DISCUSSION

### Standard of Review

■ We have repeatedly recognized that the Board "has broad discretion in resolving representation disputes." *Colquest Energy, Inc. v. NLRB*, 965 F.2d 116, 119 (6th Cir.1992). Consequently, when reviewing a Board decision in such a matter, we must ascertain only whether "the Board abused its discretion in resolving the dispute." *Id.* Moreover, a finding by the Board "that an election was conducted under fair conditions will not be disturbed on appeal where there is substantial evidence in the record as a whole to support its conclusions." *Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1155 (6th Cir.1996).

■ The burden of proving the unfairness of a representational election conducted under Board supervision is a heavy one and falls upon the party seeking to overturn the election results. See *Dayton Hudson Dep't Store Co. v. NLRB*, 987 F.2d 359, 363 (6th Cir.1993). The party challenging the election outcome must demonstrate "not only that the unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *Mitchellace, Inc.*, 90 F.3d at 1155 (citations and internal quotation marks omitted).

### Challenges to Union's Pre-election Activities

#### 1. Circulation of Second Petition

■ Keeler first challenges the propriety of union sympathizers circulating a petition seeking declarations of union support in the weeks preceding the representation election. The employer contends that the petition amounted to pre-election polling and was inherently coercive. According to the company, the objectionable character of the petition was heightened by the union's decision to publish the names of those employees who had presumably indicated their union support by signing the statement of intent.

In support of its position, Keeler cites this court to the Supreme Court decision in *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), which condemned the pre-election tactic of waiving an "initiation fee" for employees who signed "recognition slips," thus making those workers union members prior to the actual election. See *id.* at 272–73, 94 S.Ct. 495. In contrast, the actions of the UAW in the present case do not involve the inducements and coercion described in *Savair Mfg. Co.*

Here, the union, in an effort to ascertain the level of its support among employees prior to the date of the election, simply asked employees to sign sheets that stated clearly at the top:

We are the Union! We, the undersigned employees of Keeler Die Cast are voting YES on election day. We have heard all the company's arguments and accusations and we have listened to their promises. But we are standing up for ourselves, our families and our futures.

YES for justice. YES for dignity. YES for a voice in our workplace.

Furthermore, the sheets contained the statement at the bottom, "I understand that my signature will be used in a leaflet or in any other way that shows my commitment to taking charge of my own future."

■ An employer may not conduct a pre-election poll of its employees because such activity involves inherent coercion by an entity "with ... almost absolute control over employment, wages, and working conditions...." *Louis–Allis Co. v. NLRB*, 463 F.2d 512, 517 (7th Cir.1972). However, we have endorsed the NLRB position that such pre-election polling by the union is not inherently coercive. See *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 364 (6th Cir.1984); see also *Maremont Corp. v. NLRB*, 177 F.3d 573, 577–78 (6th Cir.1999) ("Vote Yes" petition circulated among employees, with notice that names of those who sign may be published in union handbill, does not interfere with free and fair choice of employees). Nevertheless, "an employer may successfully challenge a representation election if he shows that pre-election polling by the union in fact was coercive and in fact influenced the result of the election." *Kusan Mfg. Co.*, 749 F.2d at 365 (emphasis in original) (citation omitted). Keeler can make no such showing in this matter.

Indeed, the UAW had absolutely no interest in coercing employees to sign the petition because such pressure would actually have been adverse to the UAW's purposes. Rather than simply securing a large number of signatures, the union attempted, through the pre-election poll, to gauge accurately the UAW's chances of ultimate success in the election. Furthermore, the company could produce no evidence that any employee felt pressured to vote in favor of union representation as a result of the poll so that the outcome of the election was influenced by the polling.

The company did offer testimony that some employees were asked more than once to sign the petition and that one employee was told that co-workers had wagered on whether he would sign the lists. Such evidence, however, does not establish coercion to sign or, more relevantly, coercion to vote for union representation in a secret ballot. Interestingly, the employees allegedly "badgered" to sign the petition stated unequivocally that no threats or coercion were involved in their conversations with co-workers and that they did not intend to vote for the union in any event, despite signing the petition. Furthermore, the employee claiming to be traumatized by his co-workers' bets on his signing testified that he did not, in fact, sign the petition. Because Keeler has thus failed to meet its burden on this issue, the decision of the Board concluding that no unfair labor practice was committed in the circulation of the pre-election petition was proper.

### 2. Posting of Campaign Materials in Voting Area

■ Keeler next submits that the right of the employees to a fair and free election was compromised by the posting of pro-union campaign materials in the room where voting occurred. Specifically, the company alleges that fliers were placed between a window and a screen in a corner of the voting area only 15 feet from the voting booths themselves.

Recognizing that the "laboratory conditions" for which the Board strives in conducting elections are rarely attained, this court has stated that representation "elections are not automatically voided whenever they fall short of perfection." *NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 284 (6th Cir.1998) (quoting *NLRB v. Duriron Co., Inc.*, 978 F.2d 254, 256 (6th Cir.1992)). "Rather, the Board has broad discretion in determining whether election conditions allowed for the fair and free choice of bargaining representatives by employees." *Id.*

In this matter, the Board concluded that the failure to remove pro-union literature from the voting room prior to the conclusion of the morning election period did not taint the electoral freedom of the Keeler employees. First, absolutely no evidence was offered to indicate that any union official or employee was involved in the placement of the flyers. "The misconduct of a third party is given less weight than that of a Union agent in determining whether an election should be set aside ... because of the inability of unions and employers to prevent misconduct by persons over whom they have no control." *Id.* at 288.

Second, only three of the parade of company witnesses at the Board hearing testified that they had seen the objectionable literature during the morning voting period. In fact, an election observer noted that a company representative walked past the flyers on election day but made no comment about their presence. Even the company representative who eventually removed the offending paper claimed not to have noticed the flyers initially. Consequently, no evidence has been adduced by Keeler to refute the finding and recommendation of the hearing officer that any electioneering on the day of the balloting was insufficient to create an atmosphere precluding a fair and impartial election. See, e.g., *Colquest Energy, Inc.*, 965 F.2d at 120–21.

### 3. Union Use of Information Recovered from the Trash

■ In a third challenge to the conduct of the representation election, Keeler contends that the union and its supporters unscrupulously rummaged through the employer's trash to recover documents relating to management bonuses and capital improvements at the plant. According to the employer, the union then used that information to convey to the employees the impression that the union had access to internal company decision-making. An official with Keeler testified, however, that the business had no rule against employ-

ees taking garbage and that any confidential documents that are not to be seen by others are shredded prior to being discarded. Furthermore, no evidence adduced before the hearing officer substantiated the allegation that the union or union sympathizers claimed to have received the relayed information from any special source not available to other employees as well. This challenge to the administrative decision of the Board and its hearing officer is thus also without merit.

### 4. Union Use of Materials Allegedly Purporting to be Customer Endorsements

■ Keeler next argues that the union intentionally misrepresented that customers of the company would be more likely to continue working with Keeler if the union were to win the representation election. In support of this allegation, the company points to "Union-crafted artifices" "allegedly from K[eeler] customers." As found by the hearing officer, however, even the most cursory of examinations of the two letters cited by the company would put any reasonable person on notice that the correspondence did not come from management officials of Keeler's customers.

The first of the two documents is a letter to Keeler employees on UAW stationery with a prominent UAW letterhead signed by UAW officials at Lionel Trains, Inc. Any person believing this letter to be a creation of Lionel management neither read the contents of the message nor even glanced at the document itself. Similarly, the second letter is another one-page document clearly signed by employees of another plant, not by any management official. The record before this court is thus devoid of any evidence of union efforts to deceive Keeler employees regarding the feelings of company customers about the pending election. This challenge to the administrative ruling is patently without merit.

### 5. Alleged Union Promise of a Keeler Employee Local

The well-established law of this circuit holds that the Board "should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made." *Van Dorn Plastic Mach. Co. v. NLRB*, 736 F.2d 343, 348 (6th Cir.1984). In its petition for review, therefore, Keeler contends that the UAW's promises to Keeler employees of their own local union organization so deceived those individuals that they were "unable to separate truth from untruth and where their right to a free and fair choice [was] affected." *Id.*

The record before this court, however, supports the conclusion of the hearing officer that the union never promised the Keeler employees their own local. Instead, the pre-election documents highlighted by the employer simply state that the employees, as union members, would elect their own representatives and would be ultimately responsible for the direction of union activities. Such campaigning, with its references to self-governance, is not inherently misleading and, furthermore, not inconsistent with the concept of the Keeler employees joining with other employees in the area to direct grassroots, collective labor activities.

### Changed Circumstances Affecting Certification of Bargaining Unit

Subsequent to the election at Keeler Die Cast's Stevens Street plant, the UAW sought to serve as the representative of employees at Keeler Brass Company, another Grand Rapids plant. Because the union apparently was unsuccessful in its bid in that later election, and because the UAW now contends that wages and benefits should be uniform at all of Keeler's three Grand Rapids plants, the employer insists that the limited bargaining unit certified for the Die Cast plant election should be re-certified as a larger, and

presumably more pro-management, electoral body. Keeler Die Cast and the UAW previously agreed, however, on the appropriate bargaining unit for the representation election at issue in this appeal. We decline to subvert that voluntary agreement by altering the stipulation signed by Keeler Die Cast, the UAW, and the regional director of the NLRB.

### Election During Pendency of Unresolved Unfair Labor Practices

In a final issue on appeal, Keeler Die Cast curiously maintains that it should have been able to delay the representation election indefinitely by refusing to remedy a prior finding of an unfair labor practice at the Keeler Die Cast facility involving the company's "domination of, and provision of support to, an in-house organization." As noted by the Board in its ruling, however, Keeler obviously knew of the prior violation and could have raised this issue prior to stipulating to the election that was held at the plant. Furthermore, the union victory in the election effectively moots the necessity of resolving the prior domination charge prior to voting.

### CONCLUSION

The party desiring to overturn the results of a Board-conducted representation election bears a heavy burden in establishing the unfairness of that contest. In this case, Keeler Die Cast has failed to prove that any actions undertaken by the UAW or its agents so interfered with the employees' exercise of their free choice as to taint the electoral process and materially affect the results of the election. We therefore DENY Keeler's petition for review of the Board's finding of an unfair labor practice for refusing to bargain with the UAW and GRANT the Board's request for enforcement of its order.